UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22CR110(VAB) |
| Government, | |
| vs. | |
| ERIKS MAMONOVS, | 915 Lafayette Blvd<br>Bridgeport, CT<br>January 23, 2023 |
| Defendant. | |

TRANSCRIPT OF PLEA HEARING

BEFORE: THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

APPEARANCES:

FOR THE GOVERNMENT: RAHUL KALE, ESQ.
U.S. Attorney's Office-BPT
1000 Lafayette Blvd.
Bridgeport, CT 06604

FOR THE DEFENDANT: JAMES P MAGUIRE, ESQ.
Federal Defender's Office
265 Church Street
New Haven, CT 06510

Sharon Montini, RMR, FCRR
Official Court Reporter
915 Lafayette Blvd
Bridgeport, CT 06604

(Proceeding commenced 1:30 p.m.)

THE COURT: Good afternoon. Please be seated. We're here in the United States v. Eriks Mamonovs. Will counsel please state their appearances for the record.

MR. KALE: Rahul Kale on behalf of the United States. With me at counsel table is Special Agent Tim Leigh (ph) of the FBI. Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MAGUIRE: Good afternoon. James Maguire for Eriks Mamonovs. With me at counsel table is Mr. Mamonovs. We're joined by Zoom by Mr. Mamonovs's wife and his relative.

THE COURT: All right, great. Thank you very much.

And I understand -- I also understand we have an interpreter for Mr. Mamonovs who is available by videoconference.

Ms. Nuzzi, would you please swear in the interpreter.

(Oath administered.)

THE INTERPRETER: I swear that I will interpret in front of court interpretation honestly and truthfully.

THE COURT: All right. Thank you very much. Would you state your name and qualifications for the record.

THE INTERPRETER: My first name is Youri, Y-O-U-R-I. My last name is Vater, V-A-T-E-R. I'm English -- Latvian and English-Russian interpreter with experience 15 years, mostly in medical field.

THE COURT: But you have not been certified by the court as an interpreter, though, correct?

THE INTERPRETER: No, I'm not.

THE COURT: All right. Are there any objections by either of the parties for Mr. Vater serving as an interpreter? Mr. Kale?

MR. KALE: None from the government, Your Honor.

THE COURT: Mr. Maguire?

MR. MAGUIRE: No objection.

THE COURT: All right. Mr. Vater, have you had an opportunity to speak with Mr. Mamonovs?

THE INTERPRETER: Yes, I spoke to him in Latvian language.

THE COURT: Have you had any trouble communicating with him?

THE INTERPRETER: No, I don't.

THE COURT: Is there any reason why you would not be able to truly, justly, fairly, and impartially act as an interpreter?

THE INTERPRETER: I don't believe, except if the vocabulary will be very specific and difficult to understand me as not legal interpreter in the court.

THE COURT: All right. If -- understood. You are not required to understand the law, but if at any time there is some legal term that you have difficulty with, just let the Court know and we'll figure out how to deal with that. Okay?

THE INTERPRETER: Thank you.

THE COURT: All right. Assistant U.S. Attorney Kale -- I'm sorry, we're doing consecutive? What are we doing, consecutive translation? That's fine.

MR. MAGUIRE: If I may, with respect to interpretation, because Mr. Mamonovs has a Latvian copy of the plea agreement, and because he does understand conversational English, we would propose that for the portion of the discussion that is based on a reading of the plea agreement, that we proceed in English unless Mr. Mamonovs indicates he does not understand something.

THE COURT: I know, but I'm asking for purposes of translation. So is Mr. Vater going to be doing consecutive translation or are we doing a feed into his ear? What are we doing?

THE CLERK: It is consecutive, Your Honor.

THE COURT: So we'll have to pause. After everyone speaks, we'll pause and give Mr. Vater an opportunity to do the translation.

Do you understand that, Mr. Vater?

THE INTERPRETER: Yes.

THE COURT: Okay. All right. Assistant U.S. Attorney Kale, I understand the purpose of this proceeding is to accept a guilty plea; is that correct?

Mr. Vater?

MR. KALE: Yes, Your Honor.

THE COURT: Mr. Mamonovs, I want to begin by telling you to take your time during this proceeding. I'm in no hurry and I want to make sure you completely understand what you are doing today. If at any time you have any questions or problems or you need more time to speak with your lawyer, just let me know and I will give you all of the time that you need. Do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: Before accepting your plea there are a number of questions I must ask you while you are under oath to assure myself it is a valid plea. Do you understand?

THE DEFENDANT: Yes, I do understand.

THE COURT: Ms. Nuzzi, will you please swear in Mr. Mamonovs.

(Oath administered.)

THE COURT: Hang on. Is there an interpretation for this?

THE DEFENDANT: I swear that I will talk solemnly truth and only truth and nothing but truth.

THE COURT: All right. For the record, I'm going to advise you of your rights. You have the right to remain silent. You have the right not to continue with a statement. Your statements can be used against you. You have the right to counsel at every stage of these proceedings. You have the right to have counsel appointed if you cannot afford counsel. And there is an attorney-client privilege which allows you to speak confidentially with your lawyer.

Do you understand these rights?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you understand that having been sworn you'll be subject to the penalties for perjury if you make a false statement and do not answer truthfully today?

THE DEFENDANT: Yes, I do understand.

THE COURT: And do you understand if the government chooses to prosecute you for perjury or for making a false statement it can use any statement you give here today under oath?

THE DEFENDANT: Yes, I do understand.

THE COURT: Would you state your full name for the record.

THE DEFENDANT: Eriks Mamonovs.

THE COURT: Have you ever used any other names?

THE DEFENDANT: No.

THE COURT: In what year were you born?

THE DEFENDANT: 1989.

THE COURT: Where were you born?

THE DEFENDANT: Riga. City name Riga, country name Latvia.

THE COURT: Are you a United States citizen?

THE DEFENDANT: No, I am not.

THE COURT: Other than Latvia, have you

lived outside of the United States?
THE DEFENDANT: No, I am not.
THE COURT: How far did you go in school?
THE DEFENDANT: Graduated high school.
THE COURT: Are you now or have you recently been under the care of a physician, psychiatrist, social worker, or counselor?
THE DEFENDANT: No, I am not.
THE COURT: In the past 48 hours, have you taken any narcotic drugs, medicine, or pills?
THE DEFENDANT: No, I am not.
THE COURT: In the past 48 hours, have you consumed any alcoholic beverages?
THE DEFENDANT: No, I am not.
THE COURT: Have you ever been hospitalized or treated for alcoholism or a narcotics addiction?
THE DEFENDANT: No, I am not.
THE COURT: Today is your mind clear?
THE DEFENDANT: Yes, I am.
THE COURT: And you understand what is going on here today?
THE DEFENDANT: Yes, I do understand.
THE COURT: Mr. Maguire, are you sure that Mr. Mamonovs understands the nature of these

proceedings?

MR. MAGUIRE: I am.

THE COURT: And have you had any difficulty in communicating with your client?

MR. MAGUIRE: I have not.

THE COURT: Have you discussed this case with your client?

MR. MAGUIRE: I have. And we'll note that Mr. Mamonovs speaks conversational English and I have provided him with the relevant documents in English and Latvian.

THE COURT: And do you believe he understands the rights he will be waiving by pleading guilty?

MR. MAGUIRE: I do.

THE COURT: And do you have any doubt as to his competence to plead guilty at this time?

MR. MAGUIRE: I do not.

THE COURT: Mr. Mamonovs, have you had an opportunity to discuss your case with your attorney.

THE DEFENDANT: Yes, I have discussed with him.

THE COURT: And are you satisfied with the representation you have been provided?

THE DEFENDANT: Yes.

THE COURT: Assistant U.S. Attorney Kale, what's the nature of the charge and the maximum sentence involved here and any mandatory minimum?

MR. KALE: The charge is a violation of the Export Control Reform Act.

THE INTERPRETER: This is interpreter. I didn't understand the last word. Export control of?

MR. KALE: Export Control Act, meaning --

THE INTERPRETER: Act.

MR. KALE: The maximum penalty if he's convicted is 20 years' imprisonment, followed by up to three years of supervised release, a maximum fine of $1 million, and a special assessment of $100.

THE COURT: Mr. Mamonovs, do you understand the charge we're here to discuss today?

THE DEFENDANT: Yes, I do understand.

THE COURT: And do you understand the penalties that are associated with this charge?

THE DEFENDANT: Yes, I do.

THE COURT: Have you had enough opportunity and information to discuss your case with your attorney?

THE DEFENDANT: Yes, I used to have enough time to discuss this case with my attorney.

THE COURT: And do you believe your

attorney has answered your questions well enough and given you have enough advice and guidance to make a decision today?

THE DEFENDANT: Yes, I do.

THE COURT: Do you have any concerns about whether your lawyer has done a good job for you?

THE DEFENDANT: No, I do not have any concerns.

THE COURT: I'm now going to review with you the various rights that you have that you'd be giving up if you plead guilty. I'm going to go through each of them to make sure you are aware of them before you enter a plea of guilty, so please listen carefully.

The first and most important thing is that you do not have to plead guilty even if you think you are guilty. The government has to prove -- you can require the government to prove its case at trial. The prosecutor has the burden of proving the guilt of a defendant beyond a reasonable doubt, and if the prosecutor is unable to meet this burden, the jury has the duty to find a defendant not guilty. So if the jury found that the government failed to meet its burden of proof beyond a reasonable doubt that

the defendant was guilty, the jury could return a verdict of not guilty.

Do you understand?

THE DEFENDANT: Yes, I do understand.

THE COURT: So even if you believe you are guilty, you do have a choice. You may plead guilty or say to the government "meet your burden of proving my guilt beyond a reasonable doubt." You could simply say "not guilty" when I ask you how you wish to plead. You have a right to plead not guilty and you have a right to persist in that plea of not guilty.

Do you understand that?

THE DEFENDANT: Yes, I do understand.

THE COURT: If you plead not guilty, you are entitled to a speedy, public trial by jury. You are also entitled to a lawyer at every stage of the proceedings on the charge in the indictment. If you could not afford a lawyer, you would have the right to have counsel appointed to represent you.

At a trial you would be presumed innocent and the government would have to overcome that presumption and prove you guilty of each and every element of the crimes charged beyond a reasonable doubt. You would not have to prove that you were

innocent. If the government failed to meet its burden, the jury would have to find you not guilty.

Do you understand?

THE DEFENDANT: Yes, I do understand.

THE COURT: If a trial happened, the witnesses for the government would have to come into court and testify in your presence. Your counsel would have the right to cross-examine any government witnesses, object to any evidence offered by the government and offer evidence on your behalf. Your lawyer also could use a subpoena to require witnesses to testify at trial on your behalf.

At trial you would have the right to testify if you chose to do so, but you could not be required to testify. You have a constitutional right not to be compelled to take the stand at a criminal trial against yourself. If you decided not to testify, I would instruct the jury that you were exercising your right and that it could not hold that against you.

If you decide to plead guilty, I will have to ask you questions about what you did to satisfy myself that you are guilty and you'll have to answer my questions and admit your guilt. If you plead guilty and I accept your plea, you will be

giving up your right to a trial and the other rights I have discussed. There will be no trial of any kind and no right to appeal any conviction --

THE INTERPRETER: Just a second. Convictions? I need to understand this situation.

THE COURT: Conviction. If someone --

THE INTERPRETER: Ah, yes.

THE COURT: You got it?

THE INTERPRETER: Yeah, I have.

THE COURT: Although you may appeal any sentence I impose under certain circumstances. So if you plead guilty, I will simply enter a finding of guilty on the basis of your plea.

Do you understand that?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you understand all of the rights I have just reviewed with you?

THE DEFENDANT: Yes, I did understand.

THE COURT: Do you have any questions about anything that I have said so far?

THE DEFENDANT: No, I don't.

THE COURT: Are you willing to give up your right to a trial?

THE DEFENDANT: Yes, I do.

THE COURT: And are you willing to give

up the other rights that I have also discussed?

THE DEFENDANT: Yes.

THE COURT: The offense with which you intend to plead guilty is a felony offense, and if your plea is accepted you will be found guilty of this offense. In addition to sentencing you will also be subject to other consequences and demands. You will be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm. A DNA sample will be collected from you to be used for analysis and indexing and inclusion in a federal database.

Because you are not a U.S. citizen, you could be deported or removed from the United States, denied citizenship, and denied admission to the United States in the future.

Your guilty plea today may also result in a more severe penalty if you are found guilty of another crime because you could receive a more severe penalty at that time as a result of any guilty plea and conviction here.

Do you understand these additional consequences of pleading guilty?

THE DEFENDANT: Yes, I do understand.

THE COURT: Are you willing to accept all of those consequences and still willing to give up your right to a trial and the other rights I have discussed?

THE DEFENDANT: Yes, I do.

THE COURT: Is anyone threatening you or forcing you to enter a plea of guilty today?

THE DEFENDANT: No, nobody.

THE COURT: Do you want more time to talk to your lawyer about giving up your right to a trial and pleading guilty?

THE DEFENDANT: No, I don't.

THE COURT: Mr. Maguire, are you sure that your client has had enough time and information and guidance from you about the strength of the government's case and any defense case?

MR. MAGUIRE: I am.

THE COURT: And is he able to make a knowing, intelligent, and voluntary choice to plead guilty here today?

MR. MAGUIRE: He is.

THE COURT: And do you believe he understands the rights he will be waiving by pleading guilty?

MR. MAGUIRE: I believe he does.

THE COURT: And are you convinced he understands the maximum and minimum sentence involved here?

MR. MAGUIRE: I am.

THE COURT: Assistant U.S. Attorney Kale, is there a written plea agreement?

MR. KALE: Yes, there is, Your Honor.

THE COURT: And has Mr. Mamonovs and his counsel had a chance to review it?

MR. KALE: Yes, Your Honor, I believe counsel has even provided a translation of the plea agreement into Latvian to his client.

THE COURT: Mr. Mamonovs, have you had an opportunity to review this plea agreement in your native language?

THE DEFENDANT: Yes, I have read this document in several occasions.

THE COURT: Would you like a recess or more time to review the agreement or talk to your counsel about whether this is an agreement you wish to enter into?

THE DEFENDANT: No, I don't.

THE COURT: All right. Assistant U.S. Attorney Kale, would you outline the terms of the plea agreement.

MR. KALE: Yes, Your Honor. In speaking to counsel, I believe when I go through this we don't need the translation unless Mr. Mamonovs has a question for the translator.

THE COURT: Is that correct?

THE DEFENDANT: Yes.

MR. KALE: Thank you, Your Honor. The plea agreement is an eight-page document with a two-page stipulation of offense conduct and relevant conduct appended to it. It is dated today.

The plea agreement goes through the nature of the charge, including the elements, as well as the maximum penalties for the charge which I have gone over.

The plea agreement notes that the government will move Your Honor to reduce by a total of three levels Mr. Mamonovs adjusted offense level due to his prompt notification of his intention to plead guilty.

There is a guidelines stipulation between the parties. The parties agree that pursuant to sentencing guidelines Section 2M5.1(a)(1), his base offense level is 26. The parties further agree that four levels should be subtracted because Mr. Mamonovs was a minimal participant in the criminal activity.

Subtracting the three levels for acceptance of responsibility I just noted results in a total offense level of 19.

The parties believe that Mr. Mamonovs falls within Criminal History Category I. The confluence on the sentencing table of total offense level 19 with a Criminal History Category I results in an advisory guidelines range of 30 to 37 months and a fine range of 10,000 to 100,000 US dollars. Mr. Mamonovs also is subject to a supervised release term of one year to three years following any prison term.

Both parties reserve their rights to seek a departure or non-guideline sentence.

Mr. Mamonovs, by signing this agreement, understands that Your Honor is not bound by this agreement on the guidelines range. And Mr. Mamonovs further understands that he will not be permitted to withdraw the guilty plea if Your Honor imposes a sentence outside the range discussed.

The plea agreement goes on to discuss waiver of rights, including the trial rights Your Honor has gone over.

Additionally, Mr. Mamonovs has a waiver of extradition here. Should Your Honor accept Mr.

Mamonovs guilty plea, the government will not object to his release pending sentencing. Furthermore, because Mr. Mamonovs lacks legal status in the United States, the government will not object to his return to Latvia pending sentencing before Your Honor.

In exchange for this concession, Mr. Mamonovs agrees to waive extradition from Latvia or any other country outside of the United States to the United States in order to effectuate his presence at the scheduled sentencing or any other proceeding scheduled by Your Honor.

The plea agreement also contains a waiver of the statute of limitations, simply noting that if Mr. Mamonovs plea is returned in the future, the statute of limitations is tolled as of today.

The plea agreement also discusses the waiver of right to challenge his conviction, which Your Honor discussed. But, in addition, Mr. Mamonovs waives his right to bring an action under 28, United States Code, Sections 2255 or 2241 fighting any non-jurisdictional defect in the proceeding, a claim that the statute to which he's pleading guilty is unconstitutional, and a claim that his admitted conduct does not fall within the scope of the statute.

There is also a waiver of right to appeal in that Mr. Mamonovs has agreed not to appeal any sentence that does not exceed 37 months of imprisonment, three years of supervised release, a $100 special assessment, and a $100,000 fine no matter how Your Honor reaches that sentence under any analysis.

Mr. Mamonovs also agrees that he understands the immigration consequence of pleading guilty and that he may not -- he may be permanently removed from the United States by entry of his guilty plea.

Mr. Mamonovs acknowledges he's entering into this agreement freely and voluntarily because he is guilty and understands that this agreement is limited to the undersigned parties and can't bind any other federal, state, or local authority.

The plea agreement goes on to discuss collateral consequences which Your Honor has gone over, and if Mr. Mamonovs guilty plea is accepted by the Court it will satisfy his criminal liability for his conduct in this district as a result of his participation in the conduct which forms the basis of the superseding indictment.

There is a typo here. After

sentencing -- because he's pleading guilty to Count Two, after sentencing the government will move to dismiss Counts One and Three through Five. We will make that notation and initial it with Your Honor's leave -- this is on page 7 toward the bottom -- because the conduct underlying the dismissed counts will have been taken into account in determining the appropriate sentence.

Finally, the plea agreement notes that no other promises, agreements, or conditions have been entered into.

MR. MAGUIRE: The parties have made that change.

THE COURT: All right. I will highlight certain provisions of the plea agreement. I will begin by describing how sentencing works. As to any possible term of imprisonment, supervised release, criminal fine, and other parts of a sentence, there are several things you must know. First, I cannot impose a sentence above the statutory maximum or below any mandatory minimum, but I have discretion to determine where within that maximum or minimum the sentence should be. That exercise of discretion will be based on the arguments and facts set forth by the government and by you, through your lawyer, as well

as the advice I will receive from the United States Probation Office. The United States Probation Office prepares a document known as a presentence investigation report.

I also must consider the factors set forth in the principal federal sentencing statute. That statute is 18 U.S.C. Section 3553. Those factors include the nature and circumstances of the crime as well as your personal history and character. I have to decide upon a sentence that reflects the seriousness of the crime, that promotes respect for law, and that provides just punishment.

I must consider a sentence to protect the public and deter others from committing crimes. It also must serve rehabilitation goals. And the statute commands me to consider the need to provide restitution and to avoid unwarranted sentence disparities.

I have to consider what sentence is recommended by the United States sentencing guidelines. I do not have to follow what the guidelines say, but that recommendation must be considered. The guidelines provide a sentencing range based on the seriousness of the crime and on someone's past criminal behavior. There may,

however, be factors that would allow a departure from this range. So there might be facts that would cause me to sentence you to a longer or shorter term of imprisonment than the guidelines calculations.

Until you are sentenced, which will be after I receive a presentence report and hear from you, your lawyer, and the government, you cannot know with certainty what the guidelines recommendation will be. So there might be grounds -- so you won't know if there are grounds to depart from the guidelines or what the ultimate sentence will be.

I am not bound by what you and the government have agreed to regarding sentencing, although I will strongly consider it.

So you won't know your sentence until the day of sentencing. If I calculate your sentence differently from what the guidelines suggest or from you and the government agreed to or even hoped for, you will not be able to cancel the sentence, withdraw your guilty plea and go to trial.

Do you understand all of that?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you understand that I can impose a sentence more severe than you may expect?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you have any questions about anything I have explained about how your sentence will be determined?

THE DEFENDANT: No, I don't.

THE COURT: All right. I understand you wish to plead guilty to Count Two of the Export Control Reform Act. I want to discuss the penalties and sentencing scheme if you do plead guilty. It's a maximum term of imprisonment of 20 years, a minimum term of supervised release of three years.

MR. MAGUIRE: I believe -- did the Court mean maximum term?

THE COURT: I'm sorry. Yes, hang on one second. Sorry, you are right. That is right. I'm sorry. A maximum term of supervised release of three years, a fine of as much as $1 million, and a mandatory special assessment of $100. Do you understand that your sentence could be increased if, for example, you have a more serious criminal history than we're aware of now?

THE DEFENDANT: Yes, I do understand.

THE COURT: And you have discussed this possibility with your attorney?

THE DEFENDANT: Yes, I do.

THE COURT: And do you understand that if

such matters are brought to my attention and I decide to increase your sentence because of them you may not withdraw your guilty plea?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you also understand that there is a section of your plea agreement that concerns your right to appeal?

THE DEFENDANT: Yes, I do understand.

THE COURT: Have the provisions concerning waiver of appeal rights been fully explained to you?

THE DEFENDANT: Yes, I do understand.

THE COURT: In your plea agreement you voluntarily, knowingly, and intelligently waive the right to appeal or to attack the conviction or sentence if it does not exceed the following: 37 months of imprisonment, a three-year term of supervised release, a $100,000 fine, and $100 special assessment. And that's even if the Court imposes a sentence based on an analysis different from that set forth in your plea agreement, and such waivers are generally enforceable.

Do you understand that?

THE DEFENDANT: I do understand.

THE COURT: Mr. Maguire, are there any

sentencing issues you believe would survive this waiver?

MR. MAGUIRE: Not that I'm aware of.

THE COURT: If despite the waiver you wish to appeal some issue that is claimed to survive it, you must file a notice of appeal within 14 days of sentencing.

Do you understand that?

THE DEFENDANT: Yes, I understand you.

THE COURT: And are you willing to waive the appeal rights described in the plea agreement?

THE DEFENDANT: Yes.

THE COURT: All right. Now I want to turn to the elements of the offense to which you have been charged. I'm going to ask Assistant U.S. Attorney Kale to explain the elements. The elements are those facts the government would have to prove beyond a reasonable doubt before you could be convicted if you decided to plead not guilty and went to trial. The government would have to prove each of those facts by persuading a jury of 12 persons that those facts were true beyond a reasonable doubt.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Mr. Kale?

MR. KALE: The charge has four elements. The first is that Mr. Mamonovs knowing exported or caused to be exported an item subject to the export control regulations. The second is that a license was required from the licensing agency for the defendant's export. Third, that Mr. Mamonovs did so without first obtaining a license from the licensing agency. And, fourth, that Mr. Mamonovs acted willfully.

THE COURT: Do you understand these elements?

THE DEFENDANT: Yes, I do understand.

THE COURT: Do you have any question about these elements?

THE DEFENDANT: No, I don't.

THE COURT: So I want you to please tell me in your own word what you did that shows that you are, in fact, guilty of the charge which you are now offering to plead guilty.

MR. MAGUIRE: If we could have just one moment?

(Discussion held off the record.)

THE COURT: Could I just have the translation of my last statement? I can say it again.

Please tell me in your own word what you did that shows that you are in fact guilty of the charge which you are offering to plead guilty.

THE DEFENDANT: I have signed some documents causing the export of specific items, and I'm supposed to know that the item I exported will never reach Latvia.

THE COURT: I have a couple of questions. Was what -- what you were exporting, was a license required?

THE INTERPRETER: He said no, exporting to Latvia didn't require any license.

THE COURT: Hang on.

MR. KALE: Your Honor, may I clarify?

THE COURT: Yes, please.

MR. KALE: While exporting to Latvia did not require a license, exporting to Russia required a license.

THE COURT: All right. So is it your understanding that a license was required to export to Russia?

THE DEFENDANT: Yes, I do understand that.

THE COURT: All right. And the export, nevertheless, was done willfully?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Thank you. What I'm going to do now is ask Assistant U.S. Attorney Kale to summarize what you did to -- what you did and the government's evidence as to the charge against you.

MR. KALE: Your Honor, the parties have entered into an extensive stipulation of offense conduct and relevant conduct in the plea agreement, pages 9 and 10.

I would note that if this case had gone to trial the government would have shown through records of the Department of Commerce, records and testimony from Moore Tools, Incorporated in Bridgeport, Connecticut, the testimony of agents from the FBI, Homeland Security Investigations, the Department of Commerce, as well as email records seized pursuant to search warrants that Mr. Mamonovs knew or should have known that a jig grinder that he signed papers for was never going to come to his business in Latvia and that it was going to be exported outside, to Russia, and that based on his communications with co-defendants Mr. Mamonovs filed documents with the Department of Commerce saying that the jig grinder would come to Latvia and not be

re-exported. And Mr. Mamonovs did so without obtaining any license from the Department of Commerce to send this jig grinder to Russia.

That's it, Your Honor.

THE COURT: All right. Mr. Mamonovs, do you agree with Mr. Kale's summary of what you did?

MR. MAGUIRE: If I could have one moment?

(Discussion held off the record.)

MR. MAGUIRE: Just one minor clarification. Mr. Mamonovs signed documents that were then filed with the Department of Commerce. Mr. Mamonovs did not directly file them.

THE COURT: Other than that, is there anything else he said about which you disagree?

THE DEFENDANT: No.

THE COURT: Is there anything else you wish to say about his summary of what you did?

THE DEFENDANT: No.

THE COURT: All right. Returning to the plea agreement, does the plea agreement and what we've discussed today fully and accurately reflect your understanding of the agreement you are entering into?

THE DEFENDANT: Yeah.

THE COURT: And are you aware that your

attorney and the prosecutor have discussed your agreement to plead guilty?

THE DEFENDANT: Yeah.

THE COURT: And is your willingness to plead guilty based on the discussions between your lawyer and the prosecutor that have resulted in this agreement?

THE DEFENDANT: By use of --

THE INTERPRETER: He's asking again. He's asking again.

MR. MAGUIRE: So I have gotten lost in the translation.

THE INTERPRETER: He said I understand that there was a discussion between my attorney and opposite side and there was no -- any other agreement.

THE COURT: All right. Thank you. And other than the promises contained in the written agreement, has anyone made any promises that are causing you to plead guilty?

THE DEFENDANT: No.

THE COURT: Has anyone made any threats against you or is anyone in any way forcing you to plead guilty or otherwise coercing you to plead guilty?

THE DEFENDANT: No.

THE COURT: And are you pleading guilty today of your own free will and because you are, in fact, guilty?

THE DEFENDANT: Yes, I do.

THE COURT: All right. If you are ready, go ahead and sign the plea agreement and the stipulation of offense conduct.

MR. MAGUIRE: The parties have signed the agreement at page 8 and page 10. May I approach?

THE COURT: Yes.

All right. At this time I will have the clerk of court ask you how you wish to plead. This is your last opportunity to decide whether you wish to go through with this and enter a plea of guilty. Are you ready to be put to a plea?

MR. MAGUIRE: If I may have one moment?

(Discussion held off the record.)

MR. MAGUIRE: Thank you.

THE DEFENDANT: Yes, I am.

THE COURT: All right, please stand. Unless you waive a reading of the charge, I will have the charge read to you. Do you waive a reading of the charge?

THE DEFENDANT: Yes, please waive it.

THE COURT: All right, Ms. Nuzzi.

THE CLERK: Thank you, Your Honor.

In the matter of the United States of America v. Eriks Mamonovs, case number 3:22CR110, assigned to Judge Bolden, as to Count Two of the superseding indictment charging you with a violation of Title 50, United States Code, Section 4819, what is your plea?

THE DEFENDANT: Yeah, agree.

THE COURT: I'm sorry, he's got to say guilty or not guilty.

THE INTERPRETER: Guilty. He's guilty.

THE COURT: Does he say -- okay. Thank you very much.

All right. On the basis of the plea agreement and the stipulation of offense conduct and the matters discussed today, the answers given by Mr. Mamonovs on the record and in the presence of his counsel and the remarks of his counsel and the prosecution, it is the finding of the Court in the case of the United States v. Eriks Mamonovs, Mr. Mamonovs is fully competent and capable of entering an informed plea, he is aware of the nature of the charge and the consequences of the plea, and the plea of guilty is a knowing and voluntary plea. The plea

is supported by an independent basis in fact containing each of the essential elements of the offense.

The Court finds that the defendant knows of his right to plead not guilty and to a trial and related rights, and that he is giving up these rights by his plea of guilty; that he knows the maximum possible sentence and any minimum required sentence, that is, in terms of imprisonment, supervised release, monetary fine, forfeiture, restitution, and payment of a special assessment; that he knows of the Court's obligation to consider the sentencing statute and the sentencing guidelines; he knows of and accepts the terms of any plea agreement provision waiving his right to appeal or to attack his sentence; and, he has been advised of the immigration-related consequences to pleading guilty.

The plea to Count Two of the second superseding indictment is, therefore, accepted.

It's superseding, not second.

MR. KALE: Just superseding indictment.

THE COURT: I'm sorry. The plea to Count Two of the superseding indictment, therefore, is accepted, and Mr. Mamonovs is now adjudged guilty of that offense. Accordingly, a finding of guilty shall

enter and this case is referred to the United States Probation Office for a presentence investigation.

A United States probation officer will prepare a presentence report on you. It will be submitted to the Court to determine the appropriate sentence in your case. The probation officers work for the Court, not the United States Attorney's Office, so your cooperation and that of your family and friends with the probation office generally will benefit you. It is very important, however, to discuss with your attorney what you say to the probation office because the presentence report is important in the process of determining your sentence under the sentencing guidelines. Anything you, your family, friends or anyone else tells the probation officer could have an impact on your sentence and other consequences as well. You also have the right to have your attorney present during your discussions with the probation officer. So please read --

Do you understand all of that?

THE DEFENDANT: Yes, I do understand.

THE COURT: So please read and review the presentence report with your attorney. At sentencing I will ask if you have read the presentence report, understood it, and given any response you have to it

to the probation officer or to your attorney.

Mr. Maguire, I understand there is an application for release pending sentencing.

MR. MAGUIRE: There is.

THE COURT: Just the translation.

Is there an application for release pending sentencing?

MR. MAGUIRE: There is. With the consent of the government, the defense moves for Mr. Mamonovs to be released to return home to Latvia. Mr. Mamonovs has no prior criminal record, and while he is not from the United States, he is fortunate to have some family support here. Specifically, his relative Andres Lapins, who is presently on Zoom, is willing to serve as a cosigner for an appearance bond.

I'll note as well that at the outset of this case Mr. Mamonovs took the extraordinary step of agreeing to appear at the Latvian airport for extradition. So through this whole process he has demonstrated himself to be a responsible and trustworthy person.

THE COURT: All right. The United States has no objection, I assume. What's the position of the United States?

MR. KALE: Your Honor, in light of Mr. Mamonovs's minimal role in this crime, the fact that he waived extradition soon after being arrested, the fact that he has agreed to waive extradition whenever the Court wants him here, the fact that a cosigner in the United States of means is willing to sign the bond, and, finally, the fact that for a number of reasons the government and counsel believe the sentencing will be postponed for some period in this particular case, the government has no objection, Your Honor.

THE COURT: All right. Thank you.

All right. Mr. Maguire, you mentioned an appearance bond. Is there a recommendation or an amount? What are we doing with respect to the bond?

MR. MAGUIRE: We would leave that to the discretion of the Court in this case.

THE COURT: Hang on one second. A 25,000 surety bond? I think we want -- I don't think we want something tied to property, we just want --

MR. MAGUIRE: I believe a $25,000 non-surety bond, again cosigned by Mr. Mamonovs's relative, who again does have assets, would be sufficient from the defense perspective.

THE COURT: Okay. All right. Based on

the representations made by the defendant, and given the position of the United States, I hereby release him pending sentencing on a $25,000 non-surety bond cosigned by the relative appropriately identified. I won't have reporting at this point. Reporting doesn't appear to be appropriate given the distance he'll have. And he'll obviously be allowed to travel. So I don't think I will put any other conditions on the release at this time.

But you do understand a failure to appear could result in additional penalties? Do you understand that?

THE DEFENDANT: Yes, I do understand.

THE COURT: All right. So that's what I will do. I understand he has a passport that will be returned to him. So he has no restrictions on travel. We will just have that bond, and he will just need to appear when necessary.

All right, why didn't we do this. The parties -- if you could -- I can delay entering a scheduling order under Local Rule 32(f). I'm not sure if it makes sense to have something. Why don't I put a time out. Hang on one second. I will put it by February 6th.

All right. Any objection?

MR. KALE: None from government, Your Honor.

MR. MAGUIRE: No objection.

THE COURT: Anything further, Mr. Kale?

MR. KALE: Nothing from the government, Your Honor.

MR. MAGUIRE: Nor from the defense. Thank you.

THE COURT: All right. Thank you all very much.

Thank you, Mr. Vater.

We are adjourned.

(Proceeding concluded 3:00 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

7/20/23
Date

/S/ Sharon Montini
Official Reporter